UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ANNUITY, WELFARE and APPRENTICESHIP     :
SKILL IMPROVEMENT & SAFETY FUNDS of
the INTERNATIONAL UNION OF OPERATING    :
ENGINEERS, LOCAL 15, 15A, 15C and 15D,
AFL-CIO,                                :
               Plaintiffs,                                        OPINION & ORDER
                                        :
                                          11 Civ. 4112 (GWG)
                                        :

EASTPORT EXCAVATION & UTILITIES INC.,   :

                                        :
               Defendant.                               :
------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Plaintiffs The Annuity, Welfare and Apprenticeship Skill Improvement & Safety Funds

of the International Union of Operating Engineers, Local 15, 15A, 15C, and 15D, AFL-CIO (the

"Trust Funds") have brought this action pursuant to Sections 502 and 515 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1145, and Section

301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, against

defendant Eastport Excavation & Utilities Inc. ("Eastport").  The Trust Funds seek to collect

contributions that Eastport allegedly failed to pay towards employee fringe benefit trust funds

that were required by the terms of a collective bargaining agreement ("CBA") between Eastport

and Local 15, the Trust Funds' sponsoring union.  The parties consented to disposition of this

matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The Court held a

bench trial on the disputed issues in this case.  For the reasons that follow, judgment is entered in

favor of the Trust Funds.

I. BACKGROUND

The Trust Funds filed the complaint on June 16, 2011.  See Complaint, filed June 16, 2011 (Docket # 1).  The district judge to whom this case was previously assigned denied the Trust Funds' motion for summary judgment on May 8, 2013.  See Order, dated May 8, 2013 (Docket # 37).  The district judge also dismissed defendant Eastport Manor Construction Inc., which had been named as a defendant in the Trust Funds' complaint.  Id.  Prior to trial, the parties submitted proposed findings and a joint pre-trial order which contained some stipulated facts.[1]  The bench trial was held on September 23, 2013.  Following trial, the parties submitted additional materials which included proposed findings of fact.[2]

In brief, the Trust Funds contend that Eastport failed to remit fringe benefit contributions on behalf of four employees: Ronald Morrison, James Pierce, Angelo Passariello, and Howard Bonet.  Pl. Mem. at 8-10.  Eastport maintains that "plaintiffs have produced no evidence that the hours in question were worked in [Local 15's] jurisdiction," and that therefore Eastport has no burden to prove that it in fact remitted the contributions allegedly due and owing.  Def. Mem. at 6.

The Court has subject matter jurisdiction over this lawsuit under Section 502 of ERISA, 29 U.S.C. § 1132, and Section 301 of the LMRA, 29 U.S.C. § 185.  Having considered the evidence presented at trial and the parties' arguments as contained in their submissions, the

---

[1]  See Plaintiffs' Proposed Findings of Fact & Conclusions of Law, filed May 29, 2013 (Docket # 40); Joint Pretrial Order, filed May 31, 2013 (Docket # 41) ("JPTO"); Defendant's Proposed Findings of Fact, filed June 21, 2013 (Docket # 45).

[2]  Plaintiffs' Post-Trial Memorandum of Law & Proposed Findings of Fact, filed Jan. 29, 2014 (Docket # 57) ("Pl. Mem."); Defendant's Post-Trial Memorandum, filed January 29, 2014 (Docket # 59) ("Def. Mem."); Plaintiffs' Reply Post-Trial Memorandum of Law & Counterstatement to Defendant's Proposed Findings of Fact, filed Feb. 5, 2014 (Docket # 61).

Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

II.  <u>FACTS</u>

In a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited."  <u>Krist v. Kolombos Rest., Inc.</u>, 688 F.3d 89, 95 (2d Cir. 2012) (citation omitted).  "[A]s trier of fact, the judge is entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness." <u>Id.</u> (internal quotation marks and citations omitted); <u>see</u> <u>also</u> <u>Newman v. Herbst</u>, 2011 WL 684165, at *1 (E.D.N.Y. Feb. 15, 2011) ("In any bench trial, the trial judge has to evaluate the credibility of the witnesses that testify, the witnesses' demeanor, any previous inconsistent statements by a witness, as well as the witnesses's [sic] explanation for any such inconsistent statements.").

A.      <u>Undisputed Facts</u>

Local 15 represents heavy construction equipment operators throughout the five boroughs of New York City.  JPTO at 4, ¶ 2.  Local 15 and Eastport are parties to a collective bargaining agreement, which was signed on April 17, 2002, and has not expired.  <u>Id.</u> at 4, ¶ 1. Eastport is also party to a collective bargaining agreement with a different union, Local 138, whose jurisdiction covers Nassau and Suffolk Counties.  Affidavit of Direct Testimony of Vincent Quattalaro, dated Sept. 9, 2013 ("Quattalaro Aff."), at 2, n. 1.  The CBA between Eastport and Local 15 provides the terms and conditions for the employment of Eastport's employees who perform work falling under the jurisdiction of Local 15, including the terms and conditions for the payment of fringe benefit contributions by Eastport on behalf of employees performing work within Local 15's jurisdiction.  JPTO at 4, ¶¶ 3-4.  The Trust Funds are ERISA

3

benefit plans established by various "Declarations of Trust," and they provide fringe benefits to their participants, including health coverage, defined benefit and contribution retirement plans, and industry-related skill improvement courses.  See Direct Testimony Affidavit of Catherine Chase, dated Sept. 6, 2013, ¶¶ 2, 5.[3]  The amounts owed in fringe benefit contributions are paid for each hour of work performed.  Id. ¶ 6.  To satisfy the obligation, the employer provides each employee at the end of the work week with "fringe benefit stamps" that correspond to the number of hours worked by the employee that week.  Id. ¶ 6.  The employee then redeems the stamps for credit at the Funds office.  Id. ¶ 8.

After the Trust Funds filed the complaint in this action, the Trust Funds conducted an audit of the period of July 1, 2007, through June 30, 2010, which resulted in the issuance of an audit report dated September 29, 2011.  JPTO at 4-5, ¶ 6; Pl. Ex. 5.  That report identifies contributions and interest totaling $53,481 as being due and owing for the period audited, an amount which Eastport has not paid to the Trust Funds.  Id. at 5, ¶¶ 6-7.

   B.  Trial Testimony

      1.  Vincent Quattalaro

The audit is explained in detail in the direct testimony affidavit of Vincent Quattalaro, an audit manager at Armao LLP, the accounting firm retained by the Trust Funds.  See Quattalaro Aff.  The auditors used Eastport's payroll records to calculate the total payroll hours worked "in straight time" and "double time" by Howard Bonet, Ronald Morrison, Angelo Passariello, and James Pierce for the period of July 1, 2008, through June 30, 2009.  Id. ¶ 4.  The same was done for Morrison, Passariello, and Pierce for the period of July 1, 2009, through June 30, 2010.  Id.

---

[3]  Chase, along with other party witnesses, provided direct testimony by means of affidavit.  Eastport elected not to cross-examine Ms. Chase.

Quattalaro's affidavit states that "[t]hese hours were solely for work performed within Local

15's jurisdiction and did not include work performed by any of the employees in Nassau and/or

Suffolk Counties."  Id.  The auditors deducted from the total payroll hours worked for each

contract period the amount in fringe benefit stamps redeemed by each of these individuals.  Id.

The auditors then reviewed the stamp purchase history reports for the relevant time periods to

determine if Eastport had purchased stamps that had not been redeemed and found that all

stamps purchased by Eastport in each of the years had been redeemed, meaning that it was not

entitled to any credit for unredeemed stamps.  Id.  The auditors then multiplied the total

deficiency hours by the applicable regular and double time fringe benefit rates to calculate the

fringe benefit deficiency.  Id.  The CBA's interest rate of 4.25% was applied to the deficiency

through the date of the audit report (September 29, 2011) to reach the "Total Fringe Benefit

Deficiency."  Id.  This final deficiency is reflected in the audit report, where a "total fringe

benefit deficiency" of $30,373 is identified for the contract period of July 1, 2008 through June

30, 2009, along with a "total fringe benefit deficiency" of $20,249 for the contract period of July

1, 2009 through June 30, 2010.  See Pl. Ex. 5 at 6-7.  These two figures total $50,622.  Id. at 5.

After the auditors calculated this deficiency, Eastport sent a letter and various documents

to the Trust Funds' counsel and the auditors on January 27, 2012.  Quattalaro Aff. ¶ 5; Pl. Ex.

11; Def. Ex. C.  The letter to the Trust Funds' counsel stated that the documentation was being

sent "in support of [Eastport's] position that the audit . . . substantially overstates [Eastport's]

liability to Local Union 15."  Pl. Ex. 11 at 1; Def. Ex. C at 1.  Quattalaro reviewed this

documentation "to determine if any revisions to the underlying audit report were warranted," and

he reviewed his findings with Eastport's former counsel and with Stephen Governale, the

president of Eastport.  Quattalaro Aff. ¶ 5.  Quattalaro determined that no adjustments to the

underlying audit report regarding the calculated deficiency were warranted.  Id. ¶¶ 6-9.[4]

Quattalaro testified at trial that, with respect to Ronald Morrison, the auditors "reviewed the records that were presented by the employer, basically the NYS-45 quarterly tax returns and some paystubs and W-2s."  (Quattalaro: Tr. 8).[5]  When asked by the Court to clarify exactly what he relied on in conducting the audit he stated, "[w]e relied on the NYS-45s [a New York State quarterly wage reporting form] in the absence of proper employment records that were presented . . . The employee didn't present what we call an employee's earning record, which is a record that has every single transaction, weekly transaction, when the employee is paid."  (Quattalaro: Tr. 9).  He said that such a form is "generally used by every payroll company that prepares payroll for organizations" but was not sure if such forms are required by the Government.  (Quattalaro: Tr. 10).  When asked if Eastport disputed the results of the audit with

---

[4] Eastport's position on the audit is largely set out in the direct testimony declaration of Stephen Governale.  Governale's declaration states the following as to each employee:

Bonet "was employed by [Eastport] during the first 6 months of 2008 (which is not covered by the audit)."  Declaration of Direct Testimony of Stephen Governale, dated Sept. 9, 2013 ) ("Governale Decl."), ¶ 3.  Because Eastport "was no[t] paid in full for the job, Bonet['s] pay from the first two quarters of 2008 were [not] reported on [Eastport's] NYS-45 until the 4th quarter of 2008.  Bonet did not work for [Eastport] in the 4th quarter of 2008 and no fringe benefit stamps were accrued . . . [so] the auditor's report is overstated by those 85 hours."  Id.

Morrison "worked for [Eastport] for only three to four weeks.  The audit incorrectly states that he worked for [Eastport] for two years."  Id. ¶ 4.

Passariello was "employed by [Eastport] as a member of Local 138 and was paid as such with fringe benefit stamps redeemed to Local 138."  Id. ¶ 5.

Pierce was "also a Local 138 member who was allowed to work in New York City as a member of Local 14, 15 and 138.  His wages and benefit were paid through Local 138."  Id. ¶ 6.

[5] "Tr." refers to the transcript of the trial in this matter, which appears at ECF Docket # 55.

respect to Morrison, Quattalaro responded that Eastport had done so.  (Quattalaro: Tr. 12).  He also added that the auditors will "accept any additional information" and are "happy to go through it and try to work it out" when an employer disputes an audit report.  Id.  He testified that Eastport sent him additional information regarding Morrison's work, but he "found that the balances on the W-2s did not equal the annual wages that [were] presented in the fourth quarter of 2009."  Id.  He stated that a similar discrepancy between W-2s and NYS-45s arose with respect to Angelo Passariello as well.  (Quattalaro: Tr. 13).  Based on these differences, the auditors "made no adjustments at all" because they "went by the NYS-45s."  Id.  He added that the auditors "did request at one time that [they] get certified copies from New York State because [they] had no proof of payment of the tax that would help justify or help make a statement that that tax return was actually filed with the state," but he had not received any certified copies of the NYS-45s at issue.  (Quattalaro: Tr. 13-14).

When asked about whether the audit might have captured hours worked by Passariello for Local 138, of which he is a member, Quattalaro stated that "[w]hen you're working in the jurisdiction other than your home jurisdiction, you must provide hourly rates and benefits of that jurisdiction, which in this case would be Local 15.  And you have to purchase the benefits through Local 15 and Local 15 would reciprocate the money back to Local 138."  (Quattalaro: Tr. 14-15).  He added that if Eastport had already paid Local 138 for hours worked by Passariello in Local 15's jurisdiction, Eastport would have to "pay Local 15 and . . . apply for a refund from 138."  (Quattalaro: Tr. 15).[6]  Quattalaro testified that the NYS-45s do not "break

---

[6]  The Trust Funds' counsel stated that "if you pay contributions to the wrong set of funds, the legal standard is that . . . the contributions are still owed to the funds within the jurisdiction that you performed the work [in]" and that the contractor must "pay the individual's wages [at the] Local 15 rate [and] . . . purchase the fringe benefit contributions through the Local

down where somebody earned money" and "just list[] the total amount of money they earned

that year." (Quattalaro: Tr. 24). He also testified that the paystubs "don't tell you where [the

employee] worked." Id. He added, "[i]t's just a tax return; it doesn't indicate location."

(Quattalaro: Tr. 25).

Quattalaro testified that there was a "process followed at the time the audit was

conducted to ensure that hours worked outside of Local 15's jurisdiction were not incorporated

into [his] findings." (Quattalaro: Tr. 26). He stated that "[a]s a general rule, and with the

employer's cooperation, when the employer submits information to [Armao], such as remittance

reports to Local 138 or [stamp] purchases to Local 14, [they] always put those hours aside and

do not include them in the Local 15 hours." Id. He added that the auditors "also go through,

which in this case [they] couldn't, employee earnings records, and [they] actually take the hours

worked and divide it into the wages to find out what the hourly rate is if it's not stated." Id.

Then, "based upon the hourly rate, [they] may determine if that employee worked at Local 138

or in Local 15." Id.

### 2. Stephen Governale

Governale's direct testimony declaration was admitted into evidence (Tr. 32), and he was

then cross-examined by the Trust Funds' attorney. (Tr. 33). It bears noting that Governale's

declaration was highly conclusory and gave no explanation of the bases for his assertions. See

Governale Decl. During cross-examination, Governale testified that he did not know when

---

15 funds in the form of a stamp." (Tr. 17-18). Eastport's counsel did not dispute this statement
and agreed that "if the work is performed in New York City, . . . the money must get paid to
Local 15." (Tr. 22). Counsel for both parties agreed that the principal dispute in the case
concerned "whether, in fact, the particular hours that were the subject of the audit were
performed in New York City or Long Island." (Tr. 22-23).

Morrison worked for him but that it was sometime in 2009. (Governale: Tr. 33). Governale's direct testimony declaration stated that Morrison only worked for Eastport for three of four weeks, Governale Decl. ¶ 4, but Governale said on cross-examination that "[i]t might have been five or six," (Governale: Tr. 33). Governale added that Morrison's pay receipts are in "exhibit 11 . . . [s]tarting on page seven, ending on page 11." Id. The receipts indicate that Morrison worked for Eastport in September and October of 2009. (Governale: Tr. 33; Pl. Ex. 11 at 7-11). Governale then conceded that Morrison worked for Eastport for five weeks. (Governale: Tr. 36). The Trust Funds' counsel then directed Governale's attention to the NYS-45 form filed for the third quarter of 2009. (Tr. 36; Pl. Ex. 10 at 2). The NYS-45 form for that time period states that Morrison earned $4,142 from July 2009 through September 2009. (Governale: Tr. 37; Pl. Ex. 10 at 2).

Governale testified that he had no independent recollection as to whether Morrison also earned income during the fourth quarter of 2009. (Governale: Tr. 38). With respect to Eastport's NYS-45 for the fourth quarter of 2009, which shows that Morrison earned $4,964.48, Governale testified,"[o]bviously, my bookkeeper made an error and carried [Morrison] through the same amount for the next month." (Governale: Tr. 38; Pl. Ex. 10 at 7). The Court asked for clarification on whether the numbers listed for the third and fourth quarters of 2009 on the NYS-45 for Morrison were actually the same, and Governale again testified that his "bookkeeper made an error" and "[t]hat's all I can say." (Governale: Tr. 39). Governale summarized the circumstances surrounding Morrison's employment with Eastport and stated that a delegate named Greg Nolan from Local 15 had asked Governale to "do them a favor to cover a job for a nonunion worker." (Governale: Tr. 39). Under this arrangement, a construction company would pay Eastport weekly for a "20-percent markup" to pay a union worker to "sit and watch a

nonunion man work."  Id.  Governale said that the construction company, Ibex, was supposed to pay him weekly but that he "didn't get paid until the following year," and Morrison's "benefits were paid the following year, and that's what happened."  Id.  Ibex was a union contractor and was "requir[ed] to make sure that union people work for them," so they paid Eastport to "pay operators . . . to sit and watch the nonunion guy work to cover the fact that union people were being paid on the project to do the work."  (Governale: Tr. 41).  A "20-percent markup" meant, for example, that Ibex would pay $96 to Eastport, and Eastport would pay the worker $80 and keep $16 in profit.  (Governale: Tr. 43).  Governale testified that the five weeks Morrison worked for Eastport were under this arrangement and that Morrison never worked for Eastport at any other time.  Id.  Eastport's position, according to Governale, is that Morrison only "worked the dates on his payroll, on the paystubs."  (Governale: Tr. 44).  Governale agreed that Morrison worked in the third and fourth quarters of 2009, but he had no explanation for why hours worked by Morrison also appeared in a NYS-45 form for the second quarter of 2009.  (Governale: Tr. 46).  He testified that he "can't explain [his] bookkeeper's action's."  Id.  The Court asked how, if Morrison worked in the third and fourth quarters of 2009, "there could possibly have been an error in the second quarter of '09's reporting hours" and Governale responded, "I can't tell you . . . I don't know where the form went.  Maybe the guy filled it out with the 'X' in the wrong spot and it was never filed.  I can't tell you.  I don't know."   (Governale: Tr. 49).

With respect to hours worked by Pierce, Governale testified that his office had supplied records to his former attorney who concluded that Eastport had underpaid contributions on behalf of Pierce by 107 regular hours and 2.5 overtime hours.  (Governale: Tr. 51).  The Trust Funds' counsel pointed out that the NYS-45 forms filed by Eastport indicate that Pierce earned roughly $44,000 in 2009, see Pl. Ex. 10 at 2, 6, 10, 13, but that his 2009 W-2 form indicates that

he earned only $15,313.68, see Pl. Ex. 11 at 64.  (Tr. 57-59).  Governale stated that the "NYS-45s are obviously incorrect" and that he had supplied the auditors with "the man's signed pay receipts, as well as certified payrolls from the Long Island Railroad and [that was in] Local 138's territory."  (Governale: Tr. 59).  Governale then pointed to two certified payroll receipts which he contended reflected work "outside of Local 15's jurisdiction."  (Governale: Tr. 60; Pl. Ex. 11 at 67-70).

With respect to Passariello, Governale testified that "[t]here is actually an affidavit at the . . . Central Islip Federal Court for Mr. Passariello saying that he has no money owed to him for benefits from [Eastport]."  (Governale: Tr. 67).  This affidavit was not offered or admitted into evidence.  Governale added that he had tried to contact Passariello for an affidavit in this case, but Passariello did not return any of the phone calls.  Id.

Finally, as to Bonet, Governale testified that Bonet "only worked for [Eastport] for one short period of time and received the benefits for the time."  (Governale: Tr. 69-70).  He added that he did not "know what [his] accountant and what [his] bookkeeper did to put him in the audit period."  (Governale: Tr. 70).  Eastport's counsel clarified that Eastport's contention was that Bonet worked in January 2008, outside of the audit period, but "did not appear in the NYS-45 until December, so it got picked up as part of the audit when he had been paid and the stamps were paid."  (Tr. 70).  When the Court asked for clarification on why hours worked in January 2008 would have showed up in the fourth quarter of the NYS-45 tax form that year, Governale again responded, "I can't tell you . . . I don't understand why the NYS-45s come into this."  (Governale: Tr. 72).

Following Governale's testimony, the parties confirmed that, other than subpoenaed records, the parties had no further evidence to present.  (Tr. 75-76).  The subpoenaed records

were never introduced into evidence.

    C. <u>Post-Trial Proceedings</u>

The Court had been prepared to decide the case following arguments, but the parties made a joint application to adjourn the trial for 45 days so that Eastport would have an opportunity to produce additional documentation, "[t]he purpose of which [was] to determine if [the Trust Funds] can make any adjustments to the underlying report." (Tr. 78). The Trust Funds' counsel indicated that he thought the parties "could reach an amicable resolution" and that there might be "certain additional documentation" that Eastport could provide in this connection. <u>Id.</u> Eastport did not at any time seek to re-open the trial record to provide additional documentation or testimony.

When the parties were initially unable to reach a settlement, the Court granted an extension of time for settlement negotiations and set due dates for post-trial memoranda of law and for reply briefs. <u>See</u> Order, dated Nov. 15, 2013 (Docket # 51). The Court made clear that the post-trial memoranda were required to contain "citations to the transcript for all factual statements." <u>Id.</u> On January 15, 2014, the Court received a letter on behalf of both parties indicating that "the matter has not been settled and no substantive discussions have occurred since the Defendant has not produced certified copies of the 2008 and 2009 New York State payroll tax forms nor certified payroll records for work performed on Long Island." <u>See</u> Letter, dated Jan. 15, 2014 (Docket # 53). In a later order granting an extension of the due dates for the post-trial briefs, the Court reminded the parties of its previous order and stated: "As previously ordered (Docket # 51), the parties should be sure [to] provide a transcript citation for each factual statement in the briefs. Also, submit proposed findings of fact with transcript citations." <u>See</u> Order, dated Jan. 17, 2014 (Docket # 54).

12

The parties thereafter filed their post-trial memoranda.  See footnote 2 above.  As described further below, Eastport failed to comply with the Court's orders.

III.  DISCUSSION

Section 515 of ERISA provides that

[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  Section 502 of ERISA grants the trustees of a plan the right to bring an action in federal court to enforce an employer's duty under Section 515.  See 29 U.S.C. § 1132; see also Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 312-13 (2d Cir. 1990) ("ERISA sections 502 and 515 clearly give a district court subject matter jurisdiction to hear an action brought by benefit plan trustees to enforce an employer's promise to make contributions.") (citations omitted).

ERISA also mandates certain record-keeping requirements: "[E]very employer shall, in accordance with regulations prescribed by the Secretary, maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees."  29 U.S.C. § 1059(a)(1); accord Grabois v. Action Acoustics, Inc., 1995 WL 662127, at *2 (S.D.N.Y. Nov. 9, 1995) ("ERISA requires employers to maintain records so that employee benefit plans may review them to determine whether benefits are due or may become due their beneficiaries.") (citing 29 U.S.C. § 1059(a)(1)).  Employers have an affirmative duty to "furnish to benefit plans the information needed for the plans' fulfillment of their reporting duties."  Central States, Southeast and Southwest Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 573 (1985); accord N.Y.C. Dist. Council of Carpenters Pension Fund v. Quantum

13

Constr., 2008 WL 51598777, at *2 (S.D.N.Y. Dec. 9, 2008).

Where an employer has failed to keep the records required by § 1059(a)(1), case law

holds that a modified burden-shifting framework should be used to determine whether a benefit

plan has proved its entitlement to any allegedly delinquent contributions.  "Since the employer is

in the best position to know the number of hours worked, courts have determined that the

policies of ERISA are advanced by the imposition of a burden that reflects the employer's duties

under ERISA." Demolition Workers Union v. Mackroyce Contracting Corp., 2000 WL 297244,

at *7 (S.D.N.Y. Mar. 22, 2000) (quoting  Local 282 Welfare Trust Fund v. A. Morrison

Trucking, Inc., 1993 WL 120081, at *1 (E.D.N.Y. Mar. 30, 1993)).  As numerous district courts

in this Circuit have stated,

> [w]hile the Second Circuit has not specifically addressed the applicable standard
> where a benefit fund contests the amount of contributions owed by an employer,
> other circuits to consider the issue have held that where a benefit fund produces
> evidence raising genuine questions concerning an employer's failure to maintain
> adequate records, the burden shifts to the employer to come forward with
> evidence either of the precise number of hours worked or to negate the
> reasonableness of the inferences to be drawn from the plaintiff fund's evidence.

Gesualdi v. RRZ Trucking Co., LLC, 2011 WL 1988374, at *4 (E.D.N.Y. May 20, 2011)

(citations and internal quotation marks omitted); accord Duffy v. East Port Excavation &

Utilities Contractors, Inc., 2013 WL 5309758, at *4 (E.D.N.Y. Sept. 9, 2013).  Stated differently,

this framework holds that

> where an employer fails to keep proper records in conformity with his statutory
> duty, an employee carries his burden if he proves that he has in fact performed
> work for which he was improperly compensated and if he produces sufficient
> evidence to show the amount and extent of that work as a matter of just and
> reasonable inference.

Quantum Constr., 2008 WL 5159777, at *10 (quoting Combs v. King, 764 F.2d 818, 826 (11th

Cir. 1985)).  District courts in this Circuit routinely use this analysis in ERISA cases involving

claims for unpaid benefit contributions.  See, e.g., Morin v. Spectrum Contracting Grp., Inc.,
2011 WL 1323005, at *2 (E.D.N.Y. Jan 13, 2011) ("Courts within the Second Circuit have
regularly applied this burden-shifting analysis at the trial stage."); Quantum Constr., 2008 WL
5159777, at *10; Mason Tenders Dist. Council Welfare Fund v. M.A. Angeliades, Inc., 2007
WL 4208587, at *3 (S.D.N.Y. Nov. 20, 2007).

"[O]nce a plaintiff establishes his prima facie case by produc[ing] evidence that raises
genuine questions about the accuracy of the employer's records and the number of hours actually
worked, the burden shifts to the employer to come forward with evidence to counter the
plaintiff's proffer regarding the precise amount of work performed."  Quantum Constr., 2008
WL 515977, at *2 (quoting Local 282 Welfare Trust Fund, 1993 WL 120081, at *1) (internal
quotation marks omitted) (second alteration in original).  In other words, "[t]o be entitled to the
amount claimed, the plaintiffs must first meet the threshold burden of proof by produc[ing]
evidence that raises genuine questions about the accuracy of the employer's records and the
number of hours actually worked" with regard to each individual worker.  N.Y. Dist. Council of
Carpenters Pension Fund v. Perimeter Interiors, Inc., 657 F. Supp. 2d 410, 418 (S.D.N.Y. 2009)
(citations and internal quotation marks omitted) (second alteration in original).  Then, "the
burden shifts to the defendants to produce evidence of the precise amount of work performed, or
evidence that the assumptions underlying the audit are incorrect."  Id. (citation omitted).  "The
rationale behind the shifting of the burden is based on the fact that ERISA imposes a duty on the
employer to keep accurate records of the hours worked."  Local 282 Welfare Trust Fund, 1993
WL 120081, at *1; see also Brick Masons Pension Trust v. Indus. Fence & Supply Co., 839 F.2d
1333, 1338 (9th Cir. 1988) ("An employer cannot escape liability for his failure to pay his
employees the wages and benefits due to [employees] under the law by hiding behind his failure

to keep records as statutorily required.").

In this case, the Trust Funds have shown that Eastport did not keep the proper wage records. Quattalaro testified that Eastport did not produce any "employee's earning record[s], which is a record that has every single transaction, weekly transaction, when the employee is paid." (Quattalaro: Tr. 9). He testified that such a form is "generally used by every payroll company that prepares payroll for organizations." (Quattalaro: Tr. 10). There was no testimony from Governale or anyone else at Eastport that described Eastport's wage records or the means by which they were kept. Thus, we conclude that Eastport failed to fulfill its statutory duty to "maintain records with respect to each of [its] employees sufficient to determine the benefits due or which may become due to such employees," 29 U.S.C. § 1059(a)(1), and that the burden-shifting framework described above applies in this case.

A.  Delinquent Contributions

The Trust Funds seek delinquent contributions in the amount of $50,622. Pl. Mem. at 14. We begin by noting that "[c]ourts have found it appropriate to rely on an audit or an auditor's opinion to prove that defendant employers did not make required contributions to funds." Grabois, 1995 WL 662127, at *1, n. 3 (citing cases); accord Natale v. Cent. Parking Sys. of N.Y., Inc., 958 F. Supp. 2d 407, 413 (E.D.N.Y. 2013); Trustees of the Plumbers Local Union 1 Welfare Fund v. Philip Gen. Constr., 2007 WL 3124612, at *10 (S.D.N.Y. Oct. 23, 2007) ("If adequately explained and credited by the Court, the opinion of an auditor is a sufficient basis for an award of a specific amount of damages."). Thus, case law holds that a court may "rely on an audit or an auditor's report to prove that defendant employers did not make required contributions to funds." Hanley v. Orient Beach Club, Inc., 1998 WL 65990, at *5 (S.D.N.Y. Feb. 18, 1998); accord Duffy v. Beaver Site, Inc., 2011 WL 43258, at *4 (E.D.N.Y. Jan. 6,

2011).

In this case, the Trust Funds conducted an audit and explained the procedure used to calculate the allegedly deficient contributions for the four employees at issue. See Quattalaro Aff.; Pl. Ex. 5. Having reviewed the auditors' methodology and the conclusions drawn from the documentation supplied by Eastport, as well as the testimony of Quattalaro as reflected in his affidavit and his testimony at trial, the Court finds the audit to be sound and concludes that the Trust Funds have established a prima facie case that Eastport owes fringe benefit contributions for the four workers in the amount of $50,622. Cf. Fuchs v. Tara Gen. Contracting, Inc., 2009 WL 2922840, at *7 (E.D.N.Y. Sept. 8, 2009) (finding plaintiff established prima facie case to delinquent contributions where it "offered the audit reports" constructed by a retained accounting firm as well as testimony of the firm's director who "explained the steps taken to conduct the audit and how the auditors arrived at the amount of delinquent contributions due and owing"). In light of this conclusion, the burden shifts to Eastport "to come forward with evidence of the precise amount of work performed or evidence that the assumptions underlying the audit are incorrect." Duffy, 2013 WL 5309758, at *9 (citation omitted).

Eastport has made virtually no effort to meet its burden. Eastport did not call as trial witnesses any of the four workers whose hours and fringe benefit contributions form the basis of this dispute. The cross-examination of Quattalaro revealed no flaws in Armao's methodology for conducting the audit. For his part, Governale's testimony was conclusory and lacking in the sort of evidentiary detail that would allow the Court to calculate the "precise number" of hours that were being disputed. See Gesualdi, 2011 WL 1988374, at *4. When confronted with evidence supplied by Eastport itself – in particular the NYS-45 quarterly reports – that undermined his assumptions regarding hours, Governale's testimony was unpersuasive. He

17

dismissed discrepancies between his own beliefs and documents that emanated from Eastport through opaque and unexplained comments such as his company's "bookkeeper made an error" (Governale: Tr. 39) or the bookkeeper was "actually was part of the ring that was stealing money." (Governale: Tr. 62). In general, Governale was either peremptory or recalcitrant in answering questions, leading us to reject his testimony that the workers' contributions had been properly made or that the documentation he referred to that purportedly demonstrated deficiencies in some instances in the audit report should be accepted as accurate.

For example, one issue that arose at trial was the location of the work performed by some of the workers. Governale testified that a number of these hours were performed outside of Local 15's geographic jurisdiction – that is, it was performed within the jurisdiction of Local 138 or Local 14. (Tr. 49, 60-61; Governale Decl. ¶¶ 5-6). But Governale's explanation for how he knew this was not persuasive. His testimony did not lay a foundation for any documents he referred to – notably, he never described how they were created or by whom. He also never satisfactorily explained the discrepancies between his own contentions as to hours worked and those that were contained in the tax returns sent to New York State. One obvious source of support for Governale's testimony would have been records reflecting benefit contributions made by Eastport to the other locals under which some Eastport employees performed work — that is, Local 138 or Local 14 — for these workers during the periods at issue. No such documents were introduced into evidence, however.

Eastport's six-page post-trial brief contains bold statements asserting that there were no payment errors by Eastport, but the brief is entirely devoid of citations to record evidence, in contravention of two court orders. See Order, dated Nov. 15, 2013 (Docket # 51); Order, dated Jan. 17, 2014 (Docket # 54). Nor did Eastport contest the statement of the case by plaintiffs as it

18

did not submit a reply brief as contemplated by the Court's briefing schedule.  See Order, dated Nov. 15, 2013 (Docket # 51).  Putting aside the failure of proof in Eastport's case, Eastport's refusal to comply with two court orders requiring it to identify evidence that would permit a verdict in its favor causes this Court to conclude that it has not reubutted the proposed findings submitted by the Trust Funds.

In sum, we find that the Trust Funds have established their entitlement to delinquent contributions in the amounts identified in the audit report.  In light of Eastport's failure to offer any credible competent evidence to attack those findings, or to marshal and explain that evidence in its post-trial memorandum as required by the Court, we accept the benefit payment deficiency identified in the audit report.   This deficiency (without interest) totals $50,622.  See Pl. Ex. 5 at 5.

B.  Interest

The Trust Funds seek an award of $2,859 in interest on the unpaid contributions through the date of the audit report as well as prejudgment interest on the contributions from the date of the report through the date of judgment.  Pl. Mem. at 14-15.  ERISA provides that in a lawsuit for unpaid contributions in which a "judgment in favor of the plan is awarded . . . the court shall award the plan . . . interest on unpaid contributions." 29 U.S.C. § 1132(g)(2)(B); accord Gesualdi, 2011 WL 1988374, at *6 ("Pursuant to ERISA, where judgment is entered in favor of a benefit plan, the plan is also entitled to an award of interest on the unpaid contributions.") (citation omitted).  The statute further provides that "interest on unpaid contributions shall be determined by using the rate provided under the plan . . . ."  29 U.S.C. § 1132(g)(2)(E).  A document entitled "Collection & Audit Procedures" provides that "[i]nterest shall accrue on delinquent contributions from the due date at the prime rate, plus one percent."  Pl. Ex. 4 at 3,

¶ 3. Eastport does not contest the applicability of this provision. Nor does it contest the Trust Funds' statement that "[t]he prime rate at the time of the preparation of the report as well as today is 3.25%." Pl. Mem. at 14.

The Trust Funds point out that the Collection & Audit Procedures "do not provide the period over which the 4.25% rate is to be calculated." Id. at 15. They suggest that "an annual interest calculation may be applied from the date the contributions became due and owing." Id. Because Eastport has not contested this methodology, and has not contested that this amount is $2,859 as of the date of the audit report, September 29, 2011, we will accept this figure. With respect to interest on unpaid contributions from the date of the audit report until the date of judgment, plaintiff has not supplied the per-day amount. The Court has calculated it to be $5.89 per day.[7] Accordingly, the amount of interest due must be increased by $5.89 per day from September 30, 2011 until the date judgment is entered.

C. Statutory Damages

ERISA also provides for an award of statutory damages where an employer has failed to remit required benefit contributions. The statute provides that, in a successful suit for unpaid contributions,

> the court shall award the plan . . . an amount equal to the greater of . . . interest on the unpaid contributions or . . . liquidated damages provided for under the plan in an amount not in excess of 20 percent . . . of the amount [of unpaid contributions].

29 U.S.C. § 1132(g)(2)(C); accord Virga v. Bid Apple Const. & Restoration Inc., 590 F. Supp. 2d 467, 473 (S.D.N.Y. 2008) ("ERISA further demands that statutory damages be awarded in the amount equal to that of the interest due on the unpaid principal.") (citing 29 U.S.C.

---

[7] Eastport owes $50,622 in delinquent contributions. Multiplying this figure by the 4.25% interest rate, and dividing by 365, yields a per diem interest amount of $5.89.

20

§ 1132(g)(2)(C)(i)).  The Trust Funds seek an award of statutory damages equal to the interest on

the unpaid contributions, as the Trust Agreement is silent as to any liquidated damages.  Pl.

Mem. at 15.  Eastport does not contest this request.  The Trust Funds are therefore awarded an

additional sum equal to the interest amount stated in Section III.B above.

     D.  Attorneys' Fees

     The Trust Funds seek to recover attorneys' fees in the amount of $29,796.25.  Pl. Mem.

at 16.  ERISA provides that in a successful suit for recovery of unpaid contributions, "the court

shall award the plan . . . reasonable attorney's fees and costs of the action, to be paid by the

defendant."  29 U.S.C. § 1132(g)(2)(D); accord Iron Workers Dist. Council v. Hudson Steel

Fabricators & Erectors, Inc., 68 F.3d 1502, 1506 (2d Cir. 1995) ("Congress . . . made the award

of attorney fees mandatory for suits involving delinquent employers."); Demopoulous v. Mystic

Tank Lines Corp., 2008 WL 4596274, at *5 (S.D.N.Y. Oct. 16, 2008) ("When a plaintiff prevails

in an ERISA action for unpaid contributions, an award of attorneys' fees and costs under ERISA

§ 502(g)(2)(D) is mandatory.").  "While the award itself is mandatory, the amount of any such

award rests within the Court's discretion."  Gesualdi, 2011 WL 1988374, at *7 (quoting Mason

Tenders Dist. Council. v. Aurash Constr. Corp., 2006 WL 647884, at *2 (S.D.N.Y. Mar. 15,

2006) (internal quotation marks omitted)).

     As the Second Circuit noted in Arbor Hill Concerned Citizens Neighborhood Ass'n v.

Cnty. of Albany, 522 F.3d 182 (2d Cir. 2008), "[t]he most useful starting point for determining

the amount of a reasonable fee is the number of hours reasonably expended on the litigation

multiplied by a reasonable hourly rate.  This calculation provides an objective basis on which to

make an initial estimate."  Id. at 186 (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).

Hourly rates should be based on "what a reasonable, paying client would be willing to pay."

Arbor Hill, 522 F.3d at 184.  "In determining a reasonable hourly rate, the court should not only

consider the rates approved in other cases in the District, but should also consider any evidence

offered by the parties."  Orlander v. McKnight, 2013 WL 440537, at *6 (S.D.N.Y. Aug. 15,

2013) (citing Farbotko v. Clinton Cnty., 433 F.3d 204, 208-09 (2d Cir. 2005)).  Determining a

reasonable hourly rate involves a "case-specific inquiry into the prevailing market rates for

counsel of similar experience and skill to the fee applicant's counsel [, which] may . . . include

judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates

prevailing in the district."  Farbotko, 433 F.3d at 209.  As for the number of hours, it is

well-established that "any attorney  . . . who applies for court-ordered compensation in this

Circuit . . . must document the application with contemporaneous time records . . .  specify[ing],

for each attorney, the date, the hours expended, and the nature of the work done."  N.Y. State

Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983).  If a court finds

that claimed hours are "excessive, redundant, or otherwise unnecessary," it should exclude those

hours in calculating a fee award.  Hensley, 461 U.S. at 434; accord Quaratino v. Tiffany & Co.,

166 F.3d 422, 426 n. 6 (2d Cir. 1999).

        In support of their application for attorneys' fees, the Trust Funds have submitted the

affidavit of attorney James M. Steinberg along with a "reconstructed record of original time

sheets made contemporaneously with the services performed on behalf of the Plaintiffs through

January 29, 2014."  Pl. Mem. at 16; Affidavit of James M. Steinberg, dated Jan. 29, 2014

(annexed to Pl. Mem.) ("Steinberg Aff."), Ex. 1.  Such a summary is permitted by case law.  See,

e.g., Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1160-61 (2d

Cir. 1994); U.S.A. Famous Original Ray's Licensing Corp. v. Famous Ray's Pizza Buffet Inc.,

2013 WL 5363777, at *8 (S.D.N.Y. Sept. 26, 2013).  This application reflects 93.25 hours of

22

work performed by Steinberg – 34 hours of work at an hourly rate of $310 and 59.25 hours of

work at an hourly rate of $325.  Steinberg Aff. Ex. 1.  Steinberg's affidavit also states that he is a

partner at his firm and has "been practicing in this field of law since February of 1995."

Steinberg Aff. ¶ 2.  It also states that since January 1, 2013, his services "have been billed at

$325.00 per hour."  Id.  The Court has reviewed Steinberg's billing records and concludes that

the time spent in this litigation was reasonable and not excessive or duplicative.  As for his rate,

another court in this district approved an hourly rate of $310.65 for Steinberg in a similar case

decided almost three years ago. See Annuity, Welfare, Apprenticeship Skill Improvement and

Safety Funds of the IUOE v. Persico Contracting & Trucking, Inc., 2011 WL 2848151, at *5

(S.D.N.Y. July 15, 2011).  While Steinberg increased his hourly rate to $325 on January 1, 2013,

see Steinberg Aff. ¶ 2, this increased hourly rate is reasonable in light of the passage of time and

in light of fee awards made in similar situations.  See, e.g., 1199 SEIU United Healthcare

Workers East v. South Bronx Mental Health Council, Inc., 2013 WL 6003731, at *7 (S.D.N.Y.

Nov. 13, 2013) ("Courts in this district have approved hourly rates of $300-400 for partners in

labor and employment cases.").  Additionally, Eastport has not challenged the reasonableness of

the number of hours expended nor the hourly rate, and several courts have considered this to be a

relevant factor in deciding a fee application.  See, e.g., Persico, 2011 WL 2848151, at *5; Virga,

590 F. Supp. 2d at 473.  Accordingly, the Trust Funds are awarded $29,796.25 in attorneys' fees.

     E.  Costs

     The Trust Funds also seek to recover the $485 in costs they incurred for filing this action

and serving the summons and complaint on Eastport.  Pl. Mem. at 17.  As stated above, ERISA

provides that a court shall award a successful plaintiff "reasonable . . . costs of the action."  29

U.S.C. § 1132(g)(2)(D).  Eastport does not contest the Trust Funds' application for the filing fee

of $350 and process server costs of $135.  Accordingly, we award $485 in costs.

      F.  <u>Audit Fees</u>

      Finally, the Trust Funds seek to recover $10,162 in audit fees.  Pl. Mem. at 17; Pl. Ex. 6;

Steinberg Aff. Ex. 2.  This figure consists of $7,391.25 in fees "incurred as a result of the field

audit conducted by the firm retained by the Funds to review the payroll records" of Eastport and

an additional $2,770.75 "charged in connection with preparing for and participating in the trial"

held on September 23, 2013.  Pl. Mem. at 17.  ERISA provides for an award of "such other legal

or equitable relief as the court deems appropriate."  29 U.S.C § 1132(g)(2)(E).  Courts routinely

hold that audit fees are recoverable under this provision of ERISA.  <u>See</u>, <u>e.g.</u>, <u>Ferrara v. CMR</u>

<u>Contracting LLC</u>, 848 F. Supp. 2d 304, 313 (E.D.N.Y. 2012) ("The costs of an audit are

routinely recoverable in ERISA actions."); <u>Gesualdi</u>, 2011 WL 1988374, at *7 (citing cases).

Eastport has not contested the reasonableness of  these amounts, and they are in line with

amounts awarded in other cases.  <u>See</u>, <u>e.g.</u>, <u>Gesualdi v, Andrews Trucking Corp.</u>, 2010 WL

2292392, at *1 (E.D.N.Y. June 3, 2010) (awarding $13,382.50 in audit costs);  <u>Aurash Constr.</u>,

2006 WL 647884, at *4 (awarding $9,450 in audit costs).  Accordingly, the Trust Funds are

awarded $10,162 in audit costs.

*   *   *

Accordingly, we award plaintiffs the following:

| | |
|---|---|
| Unpaid fringe benefit contributions | $ 50,622.00 |
| Prejudgment Interest | $  2,859.00 plus $5.89 per day from September 30, 2011 to the date of judgment |
| Statutory damages | $  2,859.00 plus $5.89 per day from September 30, 2011, to the date of judgment |
| Attorneys' fees | $ 29,796.25 |
| Litigation costs | $     485.00 |
| Audit costs | $ 10,162.00 |
| TOTAL: | $ 96,783.25 plus $11.78 per day from September 30, 2011, to the date of judgment |

IV.  CONCLUSION

For the reasons stated above, plaintiff is entitled to judgment against defendant Eastport Excavation & Utilities Contractors Inc. in the amount of $96,783.25, plus $11.78 per day from September 30, 2011, to the date of entry of judgment   The Clerk is requested to calculate this amount, enter judgment, and close this case.

SO ORDERED.

Dated: March 17, 2014
         New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Accordingly, we award plaintiffs the following:

| | |
|---|---|
| Unpaid fringe benefit contributions | $ 50,622.00 |
| Prejudgment Interest | $  2,859.00 plus $5.89 per day from September 30, 2011 to the date of judgment |
| Statutory damages | $  2,859.00 plus $5.89 per day from September 30, 2011, to the date of judgment |
| Attorneys' fees | $ 29,796.25 |
| Litigation costs | $     485.00 |
| Audit costs | $ 10,162.00 |
| TOTAL: | $ 96,783.25 plus $11.78 per day from September 30, 2011, to the date of judgment |

## IV. CONCLUSION

For the reasons stated above, plaintiff is entitled to judgment against defendant Eastport

Excavation & Utilities Contractors Inc. in the amount of $96,783.25, plus $11.78 per day from

September 30, 2011, to the date of entry of judgment   The Clerk is requested to calculate this

amount, enter judgment, and close this case.

SO ORDERED.

Dated: March 17, 2014
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

25